**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000538
26-MAY-2023
07:46 AM
Dkt. 80 MO**

NO. CAAP-17-0000538

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

ONE KALAKAUA SENIOR LIVING ASSOCIATION,
a Hawaii non-profit corporation, Plaintiff-Appellee, v.
ALICE CLAY, Defendant-Appellant, and
HAWAI'I STATE DEPARTMENT OF HEALTH, Defendant-Appellee, and
DOES 1-10, Defendants.

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 1CC16-1-000229)

MEMORANDUM OPINION
(By: Leonard, Presiding Judge, Wadsworth and McCullen, JJ.)

Defendant-Appellant Alice Clay (**Clay**) appeals from the
Circuit Court of the First Circuit's: (1) December 19, 2016
order granting Plaintiff-Appellee One Kalakaua Senior Living
Association's (**Association**) motion for partial summary judgment
as to Count I; (2) December 19, 2016 order denying Clay's motion
for leave to file a counterclaim; (3) June 28, 2017 order
granting Association's motion for partial summary judgment as to

Count III; and (4) June 28, 2017 final judgment, which was amended on November 15, 2017.[1]  Based on the discussion below, we affirm in part and vacate in part.

## I.    BACKGROUND

Clay has been a resident and owner at One Kalakaua Senior Living Condominium Project (**One Kalakaua**) since 1997. The background in this case spans over two decades and involves a long-standing dispute between Clay and Association over One Kalakaua's operation as an assisted living facility.  Because they are central to this appeal, we begin with One Kalakaua's governing documents.

### A.    One Kalakaua's Governing Documents

#### 1.    Declaration

In 1995, One Kalakaua's Declaration (**Declaration**) was recorded with the Bureau of Conveyances, describing the project as "a single monolithic building consisting of 14 floors" and the "entire second floor is a skilled nursing facility consisting of beds, patient lounge, recreation and dining area, physical therapy room, beauty shop, nurses station and administrative area, lobby and waiting area."  (Declaration,

---

[1]  The Honorable Karen T. Nakasone presided over the December 19, 2016 orders, and the Honorable Keith K. Hiraoka presided over the June 28, 2017 order and final judgment, and the November 15, 2017 amended final judgment.

We note that Clay's opening brief does not comply with the Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4).

Article 5.0, 5.1(d)). The third to fourteenth floors have apartments, elevators, a lobby, corridors, mechanical and electrical rooms, and a trash chute. (Declaration, Article 5.1(e)).

The common elements of One Kalakaua include the "skilled nursing facility, patient lounge, recreation and dining area, physical therapy room, beauty shop, nurses station and administrative area [that] are located on the second floor." (Declaration, Article 6.4(b)). "Each apartment shall have appurtenant thereto the following undivided interest in all the common elements of the Project for determination of the common profits, expenses, voting and for all other purposes." (Declaration, Article 7.0).

The Declaration vested the administration of One Kalakaua in Association. (Declaration, Article 11.0). "The purpose of this Association is to provide a means for the governance of the Project as a senior living facility, providing such services and amenities as the Association may from time to time deem appropriate in furtherance of such purpose." (Declaration, Article 11.1(b)).

"The One Kalakaua Club is that part of the Association which provides services and amenities through the facilities to the owners and occupants of the apartments in the Project." (Declaration, Article 11.5). Available to the owner as part of

the common expense are meals, the wellness program, arts and crafts program, recreational program, and other social programs. (Declaration, Article 11.5(a)). Available to the owner through One Kalakaua Club upon request and purchase are the beauty salon, the skilled nursing facility, and "[o]ther services or uses that are offered." (Declaration, Article 11.5(b)) (emphasis added).

The Declaration also requires that

> [a]ll apartment owners . . . shall be bound by and comply strictly with the provisions of this Declaration, the By Laws of the Association and all agreements, decisions, and determinations of the Association duly and lawfully made or amended from time to time, and failure to comply with any of same shall be grounds for an action to recover sums due, for damages or injunctive relief, or both[.]

(Declaration, Article 14.0).

The Declaration defines "Act" as "the provisions of Chapter 514A, Hawaii Revised Statutes [(**HRS**)], as the same may be amended from time to time."[2] (Declaration, Article 1.0(a)). The Declaration provides for "Compliance with Laws" and that "[i]n the event of conflict the Act shall prevail over the Hawaii Nonprofit Corporation Act and an owner shall not excuse

---

[2] In 2017, the legislature repealed HRS chapter 514A and made clear that HRS "chapter 514B applies to all condominiums in the State, provided that such application shall not invalidate existing provisions of a condominiums governing documents, if to do so would invalidate a developer's reserved rights[.]" 2017 Haw. Sess. Laws Act 181, §§ 1, 2 at 629; S.B. 292, S.D. 1, 29th Leg., Reg. Sess. (2017), available at https://www.capitol.hawaii.gov/session2017/bills/SB292_SD1_.pdf; S.B. 292, H.D. 1, 29th Leg., Reg. Sess. (2017), available at https://www.capitol.hawaii.gov/session2017/bills/SB292_HD1_.pdf; S.B. 292, C.D. 1, 29th Leg., Reg. Sess. (2017), available at https://www.capitol.hawaii.gov/session2017/bills/SB292_CD1_.pdf.

an owner from observing any law and any regulation of any governmental body." (Declaration, Article 20.3). "Any dispute involving an apartment owner, the Association, the Board, or the Managing Agent shall be submitted to <u>arbitration</u> as required by the Act." (Declaration, Article 21.0) (emphasis added).

**2. By Laws**

Also in 1995, One Kalakaua's "By Laws" (**By Laws**) were recorded with the Bureau of Conveyances. The By Laws explain that the "mere acquisition or rental of any apartment or the mere act of occupancy of any apartment will signify that these By Laws are accepted, ratified, and will be complied with." (By Laws, Introduction/Preamble).

The By Laws provide that, "in the use of" One Kalakaua, "[e]very apartment owner and occupant shall at all times keep his apartment in a strictly clean and sanitary condition and observe and perform all laws, ordinances, rules and regulations now or hereafter made by any governmental authority or the Association for the period during which the same are applicable to the use of" One Kalakaua. (By Laws, Article V, Section 3(A)(6)). Also "in the use of" One Kalakaua, "[n]o unlawful use shall be made of the Project or any part thereof, and all valid laws, orders, rules and regulations of all governmental agencies having jurisdiction thereof

(collectively "Legal Requirements") shall be strictly complied with." (By Laws, Article V, Section 3(A)(11)).

Apartment owners "need not comply with any Legal Requirement so long as it shall be so contesting the validity or applicability thereof, provided that noncompliance shall not create a dangerous condition or constitute a crime or an offense punishable by fine or imprisonment," and also "that no part of the Project shall be subject to being condemned or vacated by reason of noncompliance . . . ." (By Laws, Article V, Section 3(A)(11)(ii)).

"All costs and expenses, including reasonable attorney's fees, incurred by or on behalf of the Association for . . . [e]nforcing any provision of the Declaration, By Laws, House Rules, and the Condominium Property Act . . . against an owner . . . shall be promptly paid on demand to the Association by such person . . . ." (By Laws, Article V, Sections 5(C), 5(C)(3), and 5(C)(4)).

"Each apartment owner . . . shall comply strictly with the By Laws and with the administrative rules and regulations adopted . . . . Failure to comply with any of the same shall be ground for an action to recover sums due, for damages or injunctive relief, or both . . . ." (By Laws, Article V, Section 9).

The By Laws "are subordinate and subject to all provisions of the Declaration and any amendments thereto and the Condominium Property Act ([HRS] chapter 514A, . . . as amended) which shall control in case of any conflict."  (By Laws, Article VI, Section 3).  "At the request of any party, any dispute . . . involving . . . the Association . . . relating to the interpretation, application or enforcement of [HRS chapter 514A], Declaration, By Laws, House (Building) Rules . . . shall be subject to arbitration and disposition as provided under Part VII, Arbitration, under said Chapter 514A."[3]  (By Laws, Article VI, Section 8) (emphasis added).

The By Laws also give the Board power to adopt, amend or repeal House Rules.  (By Laws, Article V, Section 4).

3.    **House Rules**

The House Rules, approved August 2015 and effective October 2015, declare that One Kalakaua "is a fee-simple condominium multipurpose senior living community that exists to support the current and enhance the future lifestyle needs of our residents."  (House Rules, Section 1 - Introduction, Mission/Vision/Values – Our Community).  "The amenities (programs and services) offered by our community are geared to

---

[3]  The By Laws make mediation available in assessment disputes and court actions by an owner "against an Association . . . to enforce any provision of the Declaration, By Laws, House Rules, or [HRS chapter 514A] . . . ."  (By Laws, Article V, Sections 1(D)(5), 1(E) and 5(D)).

meet the needs of seniors who are independent as well as those who benefit from supervised assistance of others."  (House Rules, Section 1 - Introduction, Mission/Vision/Values – Our Community).  One Kalakaua's mission is to "strive to be a leader in senior living by providing a gracious, friendly, and secure residential community that offers residents and their family's [sic] peace of mind through wellness and assisted living programs that support the continuum of care and 'aging in place'."  (House Rules, Section 1 - Introduction, Mission/Vision/Values – Our Mission).

The House Rules also acknowledge that One Kalakaua's "operation requires special policies and services in compliance with the State of [Hawai'i], Department of Health [(**DOH**)], Assisted Living Regulations . . . ."  (House Rules, Section 1 - Introduction, Acknowledgement).  The House Rules then disclose that "One Kalakaua has adopted polices and services in compliance with the State of [Hawai'i], [DOH], Assisted Living Regulations, Hawaii Administrative Rules [(**HAR**)], Title 11, Chapter 90."  (House Rules, Section 5 – Senior Living, Senior Living Disclosures).

The House Rules provide that "[a] 2-step TB clearance is required before move-in" and an "[a]nnual TB clearance is required from the [DOH], and must be obtained with written documentation given to the facility, for Independent Contracted

Caregivers." (House Rules, Section 2 - Administration, Registration, Section 5 – Senior Living, Resident Arranged Health Services). The club dues include the "State required TB clearance for all new move-ins and annually thereafter." (House Rules, Section 6 – Services, Services Included in Monthly Fees – Club Dues). "Mandatory tuberculin skin testing is also offered annually" and included in the monthly fees for the Independent Living-Wellness Program. (House Rules, Section 5 – Senior Living, Continuum of Care – Independent Living-Wellness Program).

"Owners and occupants as well as their guests shall observe and adhere to the House Rules, Declaration, and Bylaws." (House Rules, Section 2 – Administration, Violations). The minimum fine is $50, and the maximum fine is $350. (House Rules, Section 2 – Administration, Violations). Also, "[t]he Board may impose charges or penalties for violations of the Declaration, Bylaws, or House Rules" including "[e]njoin, abate or remedy by appropriate legal proceedings, either at law or in equity, the continuance of any breach, and all costs thereof, including attorney's fees, shall be borne by the defaulting apartment owner." (House Rules, Section 2 – Administration, Violations).

**B.   Clay and Assisted Living**

Clay acquired Unit 1503 in 1997, and Unit 1204 in 2004.  Clay resided in Unit 1503 until 2012, when she transferred Unit 1503 to another person and then resided in Unit 1204.

According to Clay, from 1997 to 2000, Association hired Life Care Services to provide assisted living at One Kalakaua.  Clay "was President of One Kalakaua at the time the assisted living services ceased being provided by an independent contractor at the end of calendar year 2000 and voted in favor of the termination of that independent contractor."  Clay averred that, in 2001, "One Kalakaua began to provide assistance in living services in a manner which raised licensing and insurance issues . . . ."

Also in 2001, HAR § 11-164's Exhibit A was amended.  HAR § 11-164 Exhibit A (Amended 2001, Repealed 2018).  Applying to programs licensed under Title 11 chapters 85-105, Exhibit A provided that "[a]ll residents, employees, contract workers, and volunteers working more than 10 hours per week are required to have an Entry TB Evaluation (as described in #2 below) within 1 year prior to starting work and Annual Tuberculosis Re-evaluations" except for buildings with no patient care, patients of acute inpatient facilities, and infants under twelve months old.  (Emphases added.)

10

In 2002, One Kalakaua established itself as an assisted living facility as reflected in the 2015 license below:

STATE OF HAWAII
DEPARTMENT OF HEALTH
**LICENSE**

ONE KALAKAUA SENIOR LIVING _is hereby granted a license to operate an_

ASSISTED LIVING FACILITY

_at_ 1314 KALAKAUA AVENUE, HONOLULU, HAWAII

_with a maximum of_ 166 _units. This license is valid for_ TWO YEARS

_ending_ APRIL 30, 2017 _unless revoked for just cause._

_This license is granted in accordance with provisions of the state public health laws and regulations._

_Effective Date:_ MAY 1, 2015          Director of Health

_Date Issued:_ FEBRUARY 4, 2015          By _Office of Health Care Assurance_
OHCA#4-ALF
Date Established: 8/8/02

➤ Post in a conspicuous place.
➤ License is not transferable.
➤ License shall be surrendered upon a suspension or revocation

CAPACITY OF 220 RESIDENTS
3RD TO 12TH FLOORS: 140 UNITS
13th FLOOR (14TH FLOOR): 14 UNITS
14TH FLOOR (15TH FLOOR): 12 UNITS
AMBULATORY ONLY

See Exhibit "V" of Association's Motion for Partial Summary Judgment as to Count I.  The license identifies the 166 units within One Kalakaua.

## C.    The 2002 Litigation

Clay filed a second amended complaint alleging the following:  (1) "Count I Violation of Duty of Prudent Business Practices and Breach of Fiduciary Duties[,]" and (2) "Count II Violation of Declaration/Ultra Vires[.]"  (Formatting altered.) As to Count I, Clay argued that Association breached its fiduciary duties for the following reasons:

(a) improperly operating One Kalakaua as an Assisted Living Facility first without proper licensing and proper insurance, and then without first obtaining an amendment to the Declaration;

11

>           (b) directly providing the assisted living services through
>           Association employees, and thereby incurring ever
>           increasing expenses including for wages and insurance,
>           instead of hiring a proper vendor;
>
>           (c) using common area funds and club dues to subsidize what
>           should be "pay as you go" services;
>
>           (d) reducing or eliminating services provided as part of
>           the club dues in order to use the funds for the assisted
>           living services;
>
>           (e) failing to fund the building reserve;
>
>           (f) failing to provide timely audits; and
>
>           (g) promulgating improper House Rules[.]

(Formatting altered and emphasis added.)

Clay sought, *inter alia*, declaratory relief for Association's "violation of the Declaration and/or By-Laws and acting ultra vires" in "breach of their fiduciary duties, by obtaining a license to act as an Assisted Living Facility, and operating [Association] as an Assisted Living Facility, without first presenting the issue to the homeowners and obtaining the necessary votes to amend the Declaration and By-Laws[.]"

In 2004, the Honorable Elizabeth E. Hifo concluded: (1) "The Declaration did not need to be amended to obtain an assisted living license and the Board did not breach its fiduciary duty by obtaining the assisted living facility license[,]" and (2) "The doctrine of judicial estoppel bars Plaintiffs from claiming that the Declaration was violated or needed to be amended or that the Board breached its fiduciary duty by obtaining the assisted living facility license."

Judge Hifo found that, in the Declaration, "'other services offered' at One Kalakaua by the One Kalakaua Club are 'based on the owner and/or occupant, requesting and/or purchasing the same.'" Judge Hifo also found that Clay "admits that all 'other services offered' include assisted living services and that One Kalakaua charges for all 'other services offered.'"

On December 8, 2004, Judge Hifo entered a judgment in favor of Association and against Clay.

**D. The 2016 Litigation**

**1. Pre-complaint**

In 2011, DOH's Tuberculosis Control Branch answered questions from the Hawaii Long Term Care Association (**2011 Q&A**). One of the scenarios posed by the Hawaii Long Term Care Association closely resembled the situation at One Kalakaua:

> Facility is a condominium that has been also licensed as an [assisted living facility]. Residents privately own and purchase their units and do not necessarily receive [assisted living facility] services or oversight. [Assisted living facility] services are an ala-carte feature that they must purchase separately and the majority of the residents and independent [sic] receive no [assisted living facility] services. Because residents own their unit, management has no enforcement mechanism. Are independent residents and their visitors required to have TB clearance? Is there an opportunity to address this for units that are privately owned?

(Formatting altered.) The Tuberculosis Control Branch responded that

> [a]ll residents of a facility licensed under Title 11, Chapters 85-105 by the [DOH] (Office of Health Care

13

Assurance) are required to comply with TB clearance
requirements.  The independence of a resident and
utilization of services is not used to determine if TB
clearance is required.  If the entire condominium is
licensed by the Office of Health Care Assurance, all
residents of the facility would be required to have TB
clearance.  TB clearance is not required for visitors.

In 2012, 2013, and 2014, Clay complied with the TB screening requirement.

In October 2015, Clay refused the TB reevaluation. This refusal continued for several months, and Association imposed a $50 fine in a third notice of non-compliance, a $100 fine in a fourth notice, a $200 fine in a fifth notice, a $350 fine in a sixth notice, and another $350 fine in the seventh, and final, notice.[4]

---

[4]  The non-compliance notices were as follows:

**Second Notice:**  Dated November 5, 2015 with a compliance due date of November 20, 2015.

**Third Notice:**  Dated November 23, 2015 with a $50.00 fine, a new compliance due date of December 4, 2015, and a warning of being assessed a $100.00 fine.

**Fourth Notice:**  Dated December 7, 2015 with $100.00 fine, a new compliance due date of December 18, 2015, and a warning of being assessed a $200.00 fine.

**Fifth Notice:**  Dated December 21, 2015 with a $200.00 fine, a new compliance due date of January 8, 2016, and a warning of being assessed a $350.00 fine.

**Sixth Notice:**  Dated January 11, 2016 with a $350.00 fine, a new compliance due date of January 27, 2016, and a warning of being assessed a $350.00 fine.

**Seventh Notice:**  Dated January 28, 2016 with a $350.00 fine.

On the day before the final notice, Clay filed a special proceeding in circuit court seeking to compel mediation with Association under HRS § 514B-161(a), which was assigned to the Honorable Gary W.B. Chang. Clay clarified that the only issue was the $50 fine she paid and would like to get back. On February 19, 2016, Judge Chang ruled that "the Court is unable to find sufficient legal authority authorizing [it] to issue an order compelling mediation[,]" and denied the petition without prejudice.

2. **Association's Complaint**

On February 4, 2016, Association filed a verified complaint (**Complaint**) alleging three counts.

In Count I, Association requested a declaration that:

(1) "state law requires that all One Kalakaua residents undergo annual TB skin testing as set forth in HAR Title 11, Chapter 164;"

(2) "Clay's refusal since October 2015 to undergo the annual TB skin test (or secure a letter from her physician demonstrating her medical inability to take the TB skin test, undergo a chest X-ray to clear her of TB infection, and respond to annual Health Department TB-focused questionnaires thereafter) is a violation of HAR Title 11,

Chapter 164, and also of [Association's] House
Rules; and"

(3) Association "is entitled to levy fines (and all
other penalties allowable under the House Rules)
against Ms. Clay for her refusal to undergo the
annual TB skin test (or the previously stated
alternative)."

(Formatting altered.)

In Count II, Association requested that the circuit
court "enjoin Ms. Clay from residing in the One Kalakaua
condominium community unless and until Ms. Clay demonstrates
that she has undergone either the annual TB skin test or the
previously stated alternative." The parties later stipulated to
dismiss this count as Clay submitted documents showing she was
screened for TB in May 2016 (seven months after her previous TB
screening expired).

In Count III, Association requested attorneys' fees
and costs related to Clay's refusal to take the TB skin test,
under HRS §§ 514B-157 (2006), 607-9 (1993), and 607-14.5
(Supp. 2015).

One Kalakaua attached to its Complaint as Exhibit C
the 2011 Q&A.

### 3. Clay's Answer

On February 26, 2016, Clay filed a five-page answer to the Complaint proffering nineteen defenses including that she "relies as an affirmative defense upon the . . . breach of [One Kalakaua's] governing documents." Clay filed no counterclaim with her answer.

### 4. Clay's Motion for Mediation

Ten days after filing her answer, Clay moved to compel mediation, which the circuit court granted but explained that it was not a stay of the case and the case would proceed in normal course. Association later represented that the "parties have engaged in court-ordered mediation" and "there was no settlement on the substantive issues in the case[.]"

### 5. Motion for Summary Judgment on Count I (Declaratory Relief)

In June 2016, Association moved for summary judgment on Count I (declaratory relief), arguing that undisputed facts demonstrated that Clay refused to take a TB test from October 22, 2015 to May 19, 2016, which violated One Kalakaua's By Laws and House Rules. Association also asserted that it was entitled to levy fines against Clay for refusing to comply with the TB testing requirements.

In her response to Association's motion for summary judgment, Clay argued that:

(1) [Association] has no authority to enforce state law against Ms. Clay;

(2) [Association] must amend its By-Laws and/or Declaration in order to enforce the DOH regulations against Ms. Clay and the entire One Kalakaua Project;

(3) The Board owes a fiduciary duty to Ms. Clay and all of the residents of One Kalakaua pursuant to its operating an [assisted living facility] within One Kalakaua;

(4) Ms. Clay's doctor's note satisfied the DOH guidelines and demonstrates the ambiguity within their regulations and the Board's interpretation of the same;

(5) Ms. Clay was penalized by the Board in violation of House Rules and the DOH regulations;

(6) Ms. Clay's defenses to the Motion and Complaint are not barred by the doctrine of *res judicata*; and

(7) Ms. Clay respectfully requests a continuance under [Hawaiʻi Rules of Civil Procedure (**HRCP**)] Rule 56(f).

(Formatting altered.)

In its December 19, 2016 Order, the circuit court granted summary judgment "because there are no disputed issues of material fact and [Association] has demonstrated entitlement to judgment as a matter of law . . . ." The circuit court found that it was undisputed that Clay refused the TB screening in October 2015. The circuit court further found that this refusal "violated applicable state health department laws and the One Kalakaua rules."

The circuit court stated that it

rejects Ms. Clay's arguments in opposition to the Motion that [Association] cannot enforce state laws on grounds that only the State of [Hawaiʻi] can do so. As a regulated entity under the state health law provisions that are cited in the moving papers, [Association] is bound to follow those state law provisions.

18

The circuit court clarified that "while it is being characterized by Ms. Clay as enforcement of state law, [Association] is trying to enforce its own rules and comply with state law, which it is required to do as a licensed" assisted living facility.

Finally, the circuit court stated that it "rejects Ms. Clay's arguments that One Kalakaua is improperly operating as an [assisted living facility] in breach of its fiduciary duties." To that, the circuit court concluded that "[t]hese arguments were fully litigated and decided upon in the 2002 complaint, resulting in the 2004 judgment before Judge Hifo, and are accordingly barred by principles of *res judicata*."

### 6. Motion for Leave to File Counterclaim

Also in June 2016, Clay moved for leave to file a counterclaim, arguing that (1) she did "not unduly [delay] in bringing the instant motion; (2) the amendment to the pleadings will not prejudice [One Kalakaua]; (3) [she] will be damaged should she not be allowed to file her *Counterclaim*; and (4) the motion is made in good faith and not for undue purposes." Clay explained that she "did not initially file a counterclaim as she was hopeful the matters would be resolved in mediation."

Clay attached her proposed counterclaim, which alleged eight counts. All counts were based on the propriety of One Kalakaua operating as an assisted living facility. In

19

particular, Counts 6 through 8 were in pertinent part, as follows:

### COUNT VI[5]
### BREACH OF FIDUCIARY DUTY

. . . .

39. The Board breached its duties to Ms. Clay and the members of [One Kalakaua] when it unilaterally converted One Kalakaua to an [assisted living facility], and held the owners financially responsible for the maintenance of the [assisted living facility] while requiring the owners and residents to adhere to the regulations of the [DOH], as interpreted by [One Kalakaua].

39. The Board further violated its duties to Ms. Clay individually when [sic] fined Ms. Clay in excess of $1,000.00 and ultimately sued her in an attempt to force her to comply with the Board's new rules or otherwise be able to prevent her from entering her home until the Board deemed she was in compliance. Then, after suing Ms. Clay, the Board and [One Kalakaua] Executive Director spoke out against Ms. Clay at meetings, blaming her for wasting [One Kalakaua] funds on the lawsuit and publishing such statements in [One Kalakaua] literature and meeting minutes.

. . . .

### COUNT VII[6]
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

. . . .

43. [One Kalakaua] breached this duty by, in violation of the governing documents and state law, unilaterally converting her fee simple property to an [assisted living facility], holding her financially responsible for the operation of the [assisted living facility] while forcing her to adhere to the rules and regulations of the [DOH].

. . . .

44. The Board further inflicted distress upon Ms. Clay when it fined Ms. Clay in excess of $1,000.00 and ultimately sued her in an attempt to force her to comply with the Board's new rules or otherwise be able to prevent her from entering her home until the Board deemed she was

---

[5] Count 6 included two paragraphs numbered 39.

[6] Count 7 included two paragraphs numbered 44.

in compliance.  Then, after suing Ms. Clay, the Board and [One Kalakaua] Executive Director spoke out against Ms. Clay at meetings, blaming her for wasting [One Kalakaua] funds on the lawsuit and publishing such statements in [One Kalakaua] literature and meeting minutes.

. . . .

## COUNT VIII
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

. . . .

49.  [One Kalakaua] and the Board violated its duties under HRS §§ [sic] 514B-9-10 [sic] when it began to operate an [assisted living facility] in One Kalakaua, charging the owners and residents of the property regardless of individual usage, while holding both subject to the rules and regulations it determined were applicable, ultimately suing Ms. Clay and attempting to receive Court authority to prevent her from entering the property until the Board determined she was in compliance with the Board's rules.

During the November 30, 2016 hearing on Clay's motion, Clay's attorney explained that "once it became clear to us that mediation, reaching an amicable resolution to this dispute was not possible through mediation. . . [t]hat's when Ms. Clay accepted the cost of litigation, and that this would be litigated, which is why we then filed a motion for leave to file the counterclaim."

Clay's attorney further explained, "they have changed from being awarded [sic] license to now operating this full-scale [assisted living facility], which is the crux of Ms. Clay's counterclaim, it's the operation of it."  In discussing the source of her counterclaim, Clay's attorney clarified, "[t]he source of Ms. Clay's counterclaim is the 2011 internal memo between the [DOH] that the board seems to rely

21

upon to say they can now enforce the [DOH] regulations against Ms. Clay."

The circuit court asked, "where in the counterclaim do you talk about the 2011 memo, and the alleged wrongdoing that stems from the memo[,]" and Clay's attorney did not provide a responsive answer. Clay's attorney then stated to the circuit court, "if you're at all considering denying this, you could deny it without prejudice, and we could submit a new counterclaim with the evidence we've received since then, could more substantially justify Ms. Clay's counterclaims."

The circuit court inquired, "So, at the time you filed the motion for leave to file the counterclaim, you didn't have this 2011 letter?" Clay's attorney responded, "I believe this was filed before the MSJ, Your Honor, and that letter came as part of the MSJ." But, Association's attorney clarified that he provided Clay with a copy of the proposed complaint and the 2011 Q&A:

> I sent a copy of the proposed complaint that we were going to file, including the exhibits to Mr. Revere, and said, [t]his is what we're going to file, let us know if Ms. Clay changes her position, and the 2011 letter from the DOH was referenced in the complaint, and I believe it was attached as Exhibit C.
>
> So that information was provided to Mrs. Clay's counsel before the lawsuit was ever filed.

The record also reflects that the 2011 Q&A was attached as Exhibit C to the filed Complaint.

In its December 19, 2016 order, the circuit court denied Clay's motion for leave to file a counterclaim as follows:

> "The claims set forth in the proposed Counterclaim are barred both by the statute of limitations and by the doctrine of *res judicata*. The Court rejects Clay's argument that the continuing tort doctrine applies. Accordingly, the Motion For Leave to File Counterclaim is denied based upon futility of amendment."

### 7. Motion for Summary Judgment on Count III (Fees and Costs)

In February 2017, Association moved for partial summary judgment on Count III for attorneys' fees and costs, relying on HRS §§ 514B-157 and 607-9. Association asserted that, up until January 31, 2017, it incurred $98,311.82 in fees and costs.

In opposition, Clay argued that she requested to mediate, she is a dissenter, Association was not a prevailing party in Count II, and equity requires that the court deny Association's motion.

Association later requested an additional $17,773.55 in attorneys' fees and costs for matters litigated from January 2017 to May 2017. On June 28, 2017, the circuit court

granted Association's motion for partial summary judgment pursuant to HRS § 514B-157.[7]

In its amended final judgment, the circuit court entered judgment in favor of Association and against Clay in Counts I and III, and dismissed Count II without prejudice. The circuit court awarded Association $109,401.53 in attorneys' fees, $6,693.84 in costs, and post-judgment interest. Clay filed a timely notice of appeal.

## II. DISCUSSION

On appeal, Clay contends that the circuit court erred by (1) granting Association's motion for summary judgment and denying her motion for leave to file a counterclaim based on *res judicata* and (2) awarding attorney's fees and costs.

### A. Summary Judgment and Counterclaim

In her first two points of error, Clay challenges the circuit court's *res judicata* reasoning in granting Association's motion for summary judgment on Count I and denying her motion for leave to file a counterclaim. Based on the discussion below, we hold that the circuit court did not err in granting Association's motion for summary judgment and did not abuse its

---

[7] The circuit court awarded $17,783.55 in attorney's fees and costs to Association, while Association had requested $17,773.55 in attorney's fees and costs.

discretion in denying Clay's motion for leave to file a counterclaim.

### 1. Res Judicata

"In the past, the term 'res judicata' was used to describe both claim preclusion (res judicata) and issue preclusion (collateral estoppel)." PennyMac Corp. v. Godinez, 148 Hawaiʻi 323, 328 n.5, 474 P.3d 264, 269 n.5 (2020) (citation omitted). But, the appellate courts have since clarified that these are "separate doctrines that involve distinct questions of law." Id. (citation omitted).

Here, the doctrine of issue preclusion applies. See State v. Taniguchi, 72 Haw. 235, 239, 815 P.2d 24, 26 (1991) (explaining that the appellate courts "have consistently held that where the decision below is correct it must be affirmed . . . even though the lower tribunal gave the wrong reason for its action") (citation omitted).

Issue preclusion "may preclude the relitigation of a fact or issue that was previously determined in a prior action on a different claim or cause of action between the same parties or their privies." Dannenberg v. State, 139 Hawaiʻi 39, 59-60, 383 P.3d 1177, 1197-98 (2016) (formatting altered). The test for issue preclusion requires establishing the following four elements:

> (1) the issue decided in the prior adjudication is identical to the one presented in the action in question;
>
> (2) there is a final judgment on the merits;
>
> (3) the issue decided in the prior adjudication was essential to the final judgment; and
>
> (4) the party against whom [issue preclusion] is asserted was a party or in privity with a party to the prior adjudication.

Bremer v. Weeks, l04 Hawai'i 43, 54, 85 P.3d 150, 161 (2004) (citation omitted, brackets in the original, and formatting altered).

## 2.  One Kalakaua's Operation as an Assisted Living Facility

Following a trial in the 2002 case, Judge Hifo ruled that the "Declaration did not need to be amended to obtain an assisted living license and the Board did not breach its fiduciary duty by obtaining the assisted living facility license[.]"  Judge Hifo found, among other things, that Clay failed to prove by a preponderance of the evidence that by operating as an assisted living facility "Defendants acted without authority, or against the interests of One Kalakaua" or that "Defendants have violated the Declaration or Bylaws or their fiduciary duty in any other manner."  Judge Hifo concluded that Association "complied with and [has] not violated the Declaration or the Bylaws of One Kalakaua or any other governing document" and "have not breached any duty to" Clay.  Judge Hifo then entered judgment in favor of Association and against Clay.

26

In this case, the circuit court stated that it "rejects Ms. Clay's arguments that One Kalakaua is improperly operating as an [assisted living facility] in breach of its fiduciary duties." To that, the circuit court concluded that "[t]hese arguments were fully litigated and decided upon in the 2002 complaint, resulting in the 2004 judgment before Judge Hifo, and are accordingly barred by principles of *res judicata*." This is the conclusion that Clay challenges, and this conclusion applies only to Clay's argument that One Kalakaua is improperly operating as an assisted living facility in breach of its fiduciary duties.

The circuit court appears to have used the term "*res judicata*" in a general overarching manner, but the four requirements of issue preclusion were nonetheless met. Judge Hifo determined that Association did not violate the Declaration or By Laws, or breach its fiduciary duty, by operating as an assisted living facility, Judge Hifo entered a final judgment in favor of Association and against Clay, the issues litigated were essential to the final judgment, and the parties were the same. Bremer, 104 Hawai'i at 54, 85 P.3d at 161.

Thus, Clay was precluded from asserting violation of the Declaration and By Laws or breach of fiduciary duties regarding One Kalakaua's operation as an assisted living facility in this case. See Dannenberg, 139 Hawai'i at 59-60, 383

27

P.3d at 1197-98. And the circuit court's conclusion that Clay was barred from asserting that Association breached its fiduciary duty by operating as an assisted living facility was not wrong.

3.   **The Circuit Court Did Not Err in Granting Summary Judgment**

More to the point, the circuit court decided on the motion for summary judgment based primarily on Association's governing documents and the relevant regulations, and not solely on *res judicata.*

This court reviews the granting of summary judgment de novo. Nuuanu Valley Ass'n v. City & Cnty. of Honolulu, 119 Hawaiʻi 90, 96, 194 P.3d 531, 537 (2008). Viewing the evidence in the light most favorable to the non-moving party, "summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (citation omitted).

In its motion for summary judgment as to Count I, Association argued that "HRS § 321-482(a) vests the Health Department with authority over assisted living facilities," HRS § 321-482(c) requires assisted living facilities to comply with DOH administrative rules, HAR § 11-90-3(g) requires assisted

living facilities to be licensed every two years, HAR § 11-90-3(j) suspends such license for failing to comply, HAR § 11-90-9(a)(1) requires the facility to maintain records including TB clearance, and HAR § 11-164-10 requires TB examination for all residents.  Association also explained that the 2011 Q&A made clear that "[a]ll residents of a facility licensed under Title 11, Chapters 85-105 by [DOH] are required to comply with TB clearance requirements" and "[t]he independence of a resident and utilization of services is not used to determine if TB clearance is required."

Association's exhibits included the Declaration, By Laws, House Rules, DOH license, 2011 Q&A, and a July 2014 notice reminding residents of the TB requirements.  Association also attached correspondence regarding Clay's refusal to comply with TB screening.

With the pleadings before it, the circuit court first found that "applicable state law, including HAR Title 11, Chapter 164, and other provisions set forth in [Association's Motion for Partial Summary Judgment], are applicable and compel [Association] to require all One Kalakaua residents to undergo an annual tuberculosis test."  Clay does not challenge this finding in her opening brief.

The circuit court next found that it was undisputed that Clay refused the TB screening in October 2015, which Clay also does not challenge.

Finally, the circuit court found that this refusal violated DOH "laws" and One Kalakaua rules.  Clay does not challenge this finding either.  See State v. Barros, 98 Hawaiʻi 337, 343 n.4, 48 P.3d 584, 590 n.4 (2002) (noting that "[i]f a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid") (citation omitted).

The circuit court then granted summary judgment "because there are no disputed issues of material fact and [Association] has demonstrated entitlement to judgment as a matter of law . . . ."

### a.    State Law

An assisted living facility is "a combination of housing, health care services, and personalized supportive services designed to respond to individual needs, to promote choice, responsibility, independence, privacy, dignity, and individuality."  HRS § 321-15.1 (2010).  DOH "shall have general charge, oversight, and care of the health and lives of the people of the State, and shall pursue as a goal, the achievement of health equity" and "may adopt rules that it deems necessary for the public health and safety" for various situations

30

including an assisted living facility. HRS § 321-1(a) (Supp. 2015); § 321-11(10) (2010).

"Any person, agency, or organization engaged in providing, coordinating, or monitoring comprehensive services to . . . assisted living facilities, shall meet the standards of conditions, management, and competence set by the department, and hold a license in good standing issued for this purpose by the department." HRS § 321-482(a) (Supp. 2015). Complying with the rules adopted is a condition for obtaining a license, and DOH "may suspend or revoke a license if the department deems that the agency is unwilling or unable to comply with the rules adopted . . . ." HRS § 321-482(c) and (f) (Supp. 2015). DOH rules "have the force and effect of law." HRS § 321-10 (2010).

HAR Title 11 Chapter 90 (adopted 1999) governs assisted living facilities, establishing "minimum standards and requirements for licensure to protect the health, welfare, and safety of residents in such facilities." HAR § 11-90-1. "Assisted living facilities shall serve the purpose of providing a combination of housing, meal services, health care services, and personalized supportive services designated to respond to individual needs." HAR § 11-90-1. An assisted living facility applies the principles of "(1) Aging in place; (2) Negotiated plan of care; and (3) Managed risk." HAR § 11-90-1.

All assisted living facilities "shall meet all requirements for licensure under state law."  HAR § 11-90-3(a).  HAR § 11-90-9(a) requires that the assisted living facility "shall establish policies and procedures to maintain a system of records and reports which shall include . . . [a c]opy of a current physician or primary care provider's report of resident's physical examination which includes tuberculosis clearance and verification that the resident is free from other infectious or contagious diseases."

The purpose of HRS Chapter 164 was "to establish minimum requirements for the control of [TB] in the State."  HAR § 11-164-1 (Adopted 1981, Repealed 2018).

> Requirements for examination for [TB] of employees, patients and other individuals working or residing in healthcare facilities regulated by [DOH] shall be provided in Exhibit A, "Tuberculosis Examination For All Health Care, Domiciliary Care, Day Care, and Residential Facilities and Programs Licensed under Title 11, Chapters 85-105, by the [DOH], August, 2001."

HAR § 11-164-10, Exhibit A (Amended 2001, Repealed 2018).

Exhibit A provided that "[a]ll residents, employees, contract workers, and volunteers working more than 10 hours per week are required to have an Entry TB Evaluation . . . within 1 year prior to starting work and Annual Tuberculosis Re-evaluations . . . ."  "Any person who violates any provision of this chapter shall be fined not more than $500 or imprisoned for

not more than one year or both."  HAR § 11-164-11 (Adopted 1981, Repealed 2018).

### b.  Analysis

Again, in Count I, Association requested three declarations from the circuit court.  First, Association requested declaratory relief that "state law requires that all One Kalakaua residents undergo annual TB skin testing as set forth in HAR Title 11, Chapter 164[.]"  HAR § 11-164-10 provided that individuals residing in healthcare facilities are regulated by Exhibit A.  Exhibit A governed programs licensed under Title 11 chapters 85-105 and provided that "[a]ll residents . . . are required to have . . . Annual Tuberculosis Re-evaluations[.]"

Assisted living facilities are regulated by HAR Title 11 Chapter 90, and Association established that One Kalakaua is an assisted living facility licensed by DOH.  Thus, Association established there was no genuine issue that HAR Title 11 Chapter 164 requires One Kalakaua residents to screen for TB annually.

Association next requested a declaration that "Clay's refusal since October 2015 to undergo the annual TB skin test . . . is a violation of HAR Title 11, Chapter 164, and also of [Association's] House Rules."  Association provided correspondence establishing that Clay refused to screen for TB,

33

which Clay does not refute.  As discussed above, HAR § 11-164-10 and Exhibit A require residents of licensed assisted living facilities to screen for TB annually.  Association submitted its DOH license as an assisted living facility.  In addition, One Kalakaua's House Rules require residents to screen for TB annually.  (House Rules, Section 2 - Administration, Registration, Section 6 – Services, Services Included in Monthly Fees – Club Dues).  Thus, Association established that there was no genuine issue that Clay's refusal to screen for TB violated HAR Title 11, Chapter 164 and One Kalakaua's House Rules.

Finally, Association requested a declaration that it "is entitled to levy fines (and all other penalties allowable under the House Rules) against Ms. Clay for her refusal to undergo the annual TB skin test (or the previously stated alternative)."  One Kalakaua's House Rules allow fines for violation of House Rules, and House Rules provide that annual TB screening is required.  (House Rules, Section 2 - Administration, Registration, Section 2 – Administration, Violations, Section 6 - Services, Services Included in Monthly Fees - Club Dues).  Thus, Association established that there was no genuine issue that it may levy fines for Clay's refusal to screen for TB under One Kalakaua's House Rules.

Here, One Kalakaua established that it was entitled to a declaratory relief on Count I because, even when viewing the

34

filings and evidence it presented in the light most favorable to Clay, no genuine issue existed as to One Kalakaua's three requests for declaratory relief in Count I of its complaint.

In defending the motion, Clay did not dispute that she refused to screen for TB, and did not "set forth specific facts showing that there is a genuine issue for trial" as to the declaratory relief requested. Dairy Rd. Partners v. Island Ins. Co., 92 Hawaiʻi 398, 412, 992 P.2d 93, 107 (2000). Instead, Clay argued that Association attempted to enforce State law and failed to amend the By Laws and House Rules and breached its fiduciary duty with respect to operating as an assisted living facility, the latter of which was litigated and resolved in the 2002 litigation as discussed above.

Thus, the circuit court did not err in granting Association's motion for summary judgment on Count I.

### 4. The Circuit Court Did Not Abuse Its Discretion in Denying Clay's Motion For Leave to File a Counterclaim

Clay also contends that the circuit court "committed reversible error where it . . . denied [her] Motion for Leave to File a Counterclaim as moot due to res judicata where Ms. Clay was challenging facts that had occurred after the initial lawsuit and court order." Clay argues that the "allegations in the previous complaint then, and the Court's findings therein, pertain to [Association] *obtaining* the assisted living license,

35

and its actions *prior to obtaining* said license." Clay asserts that these "allegations and court findings are categorically different than the allegation in [her] proposed Counterclaim, as well as [Association's] complaint seeking injunctive relief to require [her] to adhere to the regulations of [DOH]."

The circuit court denied Clay's motion for leave to file her counterclaim finding that the "claims set forth in the proposed Counterclaim are barred both by the statute of limitations and by the doctrine of *res judicata*." The Court then stated that it "rejects Clay's argument that the continuing tort doctrine applies" and denied her motion for leave to file the counterclaim "based upon futility of amendment."

Clay challenges the circuit court's ruling only to the extent that it applied *res judicata*.

In her motion for leave to file a counterclaim, Clay argued that Association "wrongfully has acted as if it amended the Declaration and Bylaws when it began operating a full-service [assisted living facility] from within One Kalakaua . . . ." In all counts except Count V, Clay alleged in some form that the Association violated its declaration, bylaws, or fiduciary duty by operating as an assisted living facility. Count V alleged unjust enrichment in operating as an assisted living facility.

As discussed above, the circuit court met the four requirements of issue preclusion and the issue of Association operating as an assisted living facility was precluded. Clay contends on appeal that her claims included allegations of events that occurred in late 2011 and after, but these allegations were thoroughly interwoven with her allegations Association was violating its governing documents and fiduciary duty by operating as an assisted living facility, and Clay never explained below (nor does she on appeal) what claims she was asserting based on these allegations separate and apart from her precluded claims. Indeed, at the hearing of her motion for leave to file the counterclaim, she conceded that "the crux" of her claim was "the operation of" One Kalakaua as an assisted living facility, *i.e.*, the very issue that is precluded.

To the extent Counts 6, 7, and 8 of Clay's proposed Counterclaim included allegations challenging Association's post-2011 enforcement of DOH regulations regarding TB testing against Clay, we have affirmed the circuit court's grant of summary judgment on Count I of Association's Complaint, *i.e.*, a grant of declaratory judgment that, among other things: (1) Clay's refusal to comply with TB clearance requirements violated HAR Title 11, Chapter 164 and One Kalakaua's House Rules; and (2) Association was entitled to levy fines and other penalties allowable under its House Rules against Clay for her

37

refusal to comply with TB clearance requirements.  See, e.g., By Laws, Article IV, Section (1)(p); Article V, Section 9 and House Rules; Section 2 – Administration, Violations (authorizing both fines and an action for injunctive relief, such as seeking an order enjoining residence at One Kalakaua for failure to comply with the Bylaws).

Given the context in which Clay sought to file her proposed Counterclaim,[8] she never explained below (nor does she explain on appeal) what claims she was asserting or could assert based on Association's post-2011 enforcement of DOH regulations regarding TB testing that were separate and apart from her precluded claims.[9]

Under these circumstances, the circuit court did not abuse its discretion in denying Clay's motion to file a counterclaim.  See HRCP Rule 13(f); Marks v. Marks, 51 Haw. 548,

---

[8]  Clay's motion for leave to file the counterclaim and Association's motion for summary judgment on Count I were both filed in June 2016 and were both heard and decided during the same November 30, 2016 hearing.  The orders denying Clay's motion and granting Association's motion were both entered on December 19, 2016.

[9]  During the November 30, 2016 hearing on Clay's motion, her counsel asserted that "the source of Ms. Clay's counterclaim is the 2011 internal memo between [DOH] that the board seems to rely upon to say they can now enforce the [DOH] regulations against [her]."  But, when the circuit court asked where in the counterclaim Clay raised the 2011 Q&A, Clay's counsel's answer was nonresponsive.  See supra at 21-22.

In fact, Clay's proposed counterclaim did not mention the 2011 Q&A, despite the fact that it was attached as an exhibit to Association's February 4, 2016 Complaint, and was thus available to Clay when she filed her February 26, 2016 answer, as well as when she later moved for leave to file the counterclaim.

560, 563, 465 P.2d 996, 1002, 1004 (1970); <u>Bailey v. Duvauchelle</u>, 143 Hawaiʻi 234, 426 P.3d 458, No. CAAP-16-0000072, 2018 WL 4627593 at *4 (App. Sept. 27, 2018) (SDO) (explaining that the "denial of an HRCP Rule 13(f) motion is reviewed for abuse of discretion"); <u>Bank of Hawaii v. Mostoufi</u>, 138 Hawaiʻi 141, 377 P.3d 1059, No. CAAP-14-0001073, 2016 WL 3615334 at *2 (App. June 30, 2016) (SDO) (same).

Moreover, in her opening brief, Clay did not challenge the circuit court's independent basis for denying her motion for leave to file the counterclaim – that her proposed claims were barred by the applicable statutes of limitations. Instead, after Association's answering brief pointed out this deficiency (and the related waiver of Clay's argument), Clay made a statute of limitations argument in her <u>reply brief</u>. There, she claimed she had not waived her statute of limitations argument and could raise the issue for the first time in her reply brief because she had made a statute of limitations argument in the circuit court, in her reply memorandum in support of her motion for leave to file the counterclaim and at the hearing of her motion.

Clay's position, which deprived Association of an opportunity to answer her argument challenging an independent basis for the circuit court's ruling, patently violates HRAP Rule 28(b)(4) and (7). <u>See Hawaii Ventures, LLC v. Otaka, Inc.</u>,

114 Hawaiʻi 438, 472 n.17, 164 P.3d 696, 730 n.17 (2007) ("[Appellant's] aforementioned point of error is deemed waived for failure to present any argument in its opening brief in the first instance and presenting such arguments in its reply brief to which no answer could be made"); Galliard v. Rawsthorne, 150 Hawaiʻi 169, 178, 498 P.3d 700, 709 (2021) (same). Thus, this untimely challenge is deemed waived. HRAP Rule 28(b)(4) and (7); Galliard, 150 Hawaiʻi at 178, 498 P.3d at 709; Hawaii Ventures, 114 Hawaiʻi at 472 n.17, 164 P.3d at 730 n.17; In re Hawaiian Flour Mills, Inc., 76 Hawaiʻi 1, 14 n.5, 868 P.2d 419, 432 n.5 (1994) (explaining that arguments raised for the first time in the reply brief are deemed waived).

Under these circumstances, we cannot conclude that the circuit court exceeded the bounds of reason or disregarded rules or principles of law and, thus, we cannot conclude that the circuit court abused its discretion in denying Clay's motion for leave to file her counterclaim.

**B. Attorneys' Fees, Costs, And Fines**

Clay's remaining points of error challenge the circuit court's award of attorneys' fees and costs, as well as fines imposed by the Association.

40

### 1.    Attorney's Fees and Costs

In Count III of its Complaint, Association sought an award of attorney's fees and costs.  Association moved for summary judgment on Count III, and Clay objected.  Relying on HRS § 514B-161(a) (Supp. 2016), Clay argued that she "should not be required to pay [Association's] excessive attorneys' fees under HRS § 514B-157 as she requested mediation of this dispute on multiple occasions, both before and after [Association] chose to sue [her], and did mediate in good faith once the Court compelled [Association] to participate in said mediation." Association countered that it was not required to mediate because its complaint fell under an HRS § 514B-161(b) exception.

The circuit court granted Association's motion for summary judgment ordering Clay to pay $92,006.25 in attorney's fees and $6,305.27 in costs for legal services rendered from November 2015 to January 2017, plus an additional $17,783.55 for legal services rendered since January 2017.  The circuit court relied on HRS § 514B-157,[10] and made no determination regarding

---

[10]  HRS § 514B-157(a) provides:

> (a)  All costs and expenses, including reasonable attorneys' fees, incurred by or on behalf of the association for:
>
> (1)    Collecting any delinquent assessments against any owner's unit;
>
> (2)    Foreclosing any lien thereon; or
>
> (continued . . .)

41

Clay's HRS § 514B-161(a) argument or Association's HRS § 514B-161(b) counterargument.

On appeal, Clay again relies on HRS § 514B-161(a) and argues that the circuit court "committed reversible error where it awarded attorneys' fees where [she] demanded mediation on numerous occasion [sic], which [Association] refused and opposed, without ever finding on the record whether [she] did request and have a right to mediation and how such finding impacted the award of fees[.]"  Clay also relies on Ass'n of Apartment Owners of Discovery Bay v. Mitchell, 134 Hawai'i 251, 339 P.3d 1052 (2014).

HRS § 514B-161(a) requires participation in mediation under certain circumstances, and the circuit court may consider a party's refusal to mediate in awarding fees and costs:

> If an apartment owner or the board of directors requests mediation of a dispute involving the interpretation or enforcement of the association of apartment owners' declaration, bylaws, or house rules, the other party in the dispute shall be required to participate in mediation.  Each party shall be wholly responsible for its own costs of participating in mediation, unless both

---

(. . . continued)

> (3)     Enforcing any provision of the declaration, bylaws, house rules, and this chapter, or the rules of the real estate commission;

> against an owner, occupant, tenant, employee of an owner, or any other person who may in any manner use the property, shall be promptly paid on demand to the association by such person or persons; provided that if the claims upon which the association takes any action are not substantiated, all costs and expenses, including reasonable attorneys' fees, incurred by any such person or persons as a result of the action of the association, shall be promptly paid on demand to such person or persons by the association.

42

> parties agree that one party shall pay all or a specified portion of the mediation costs. <u>If a party refuses to participate in the mediation of a particular dispute, a court may take this refusal into consideration when awarding expenses, costs, and attorneys' fees.</u>

HRS § 514B-161(a) (emphases added).

Mediation, however, is not mandatory under HRS § 514B-161(b) where the health and safety of unit owners are at issue:

> "Nothing in subsection (a) shall be interpreted to mandate the mediation of any dispute involving . . . [a]ctions <u>seeking equitable relief involving</u> threatened property damage or the <u>health or safety of association members or any other person</u>[.]"

HRS § 514B-161(b)(1) (Supp. 2016) (emphases added).

In <u>Mitchell</u>, the association was awarded attorney's fees and costs pursuant to HRS § 514B-157, over Mitchell's objections, which included that the association refused to mediate the dispute pursuant to HRS § 514B-161(a). 134 Hawai'i at 252-53, 339 P.3d at 1053-54. On appeal and *certiorari*, Mitchell challenged the award of fees and costs, arguing that the association's refusal to participate in mediation precluded it from receiving an award of fees and costs under HRS § 514B-161(a). 134 Hawai'i at 254-55, 339 P.3d at 1055-56.

The Hawai'i Supreme Court explained that although the court has discretion under HRS § 514B-161(a) to consider the refusal to mediate in awarding fees and costs, it "cannot assume

that the circuit court in this case exercised such discretion simply by virtue of having reduced the [association's] fee award, because the hearing transcript is silent on the matter." 134 Hawaiʻi at 254-55, 339 P.3d at 1055-56.  The supreme court noted that Mitchell expressly raised HRS § 514B-161(a), and "[g]iven the legislature's intent to encourage mediation of condominium disputes, the circuit court should have addressed whether HRS § 514B-161(a) applied."  134 Hawaiʻi at 255, 339 P.3d at 1056.

The supreme court then directed the circuit court on remand to "determine whether the [association] refused to participate in mediation, and if so, the circuit court should consider, on the record, such refusal in determining whether to award attorney's fees and costs."  Id.

As in Mitchell, we cannot assume that the circuit court considered the application of HRS §§ 514B-161(a) and (b) because the circuit court made no ruling on the matter despite it being expressly raised by both parties.  The circuit court, thus, erred in granting summary judgment on Count III and abused its discretion in awarding attorney's fees and costs.

On remand, the circuit court should determine, on the record, whether HRS § 514B-161(a) or (b) controls in this case. And should the circuit court determine that HRS § 514B-161(a) controls, the circuit court should then place on the record

44

whether a refusal to mediate, if any, was taken into consideration when awarding fees and costs.

Finally, in light of our decision to vacate the circuit court's award of fees and costs and remand this case for further proceedings, we need not address Clay's alternative arguments based on public policy and HAR § 11-90-10(b)(3).

## 2.    Association Fines

In conjunction with her challenge of attorney's fees and costs, Clay argues that the imposition of fines was "well over the maximum by the House Rules, but the Board did not give [her] notice or an opportunity for a hearing, and actively opposed [her] requests for mediation." As discussed above, the imposition of a fine was authorized. However, the basis for the circuit court's approval of fines in excess of the $350.00 maximum is unclear. Therefore, on remand, the circuit court is directed to determine the propriety of the fines in the amount of $1,050.00.

## III. CONCLUSION

Based on the foregoing, we affirm the circuit court's (1) December 19, 2016 order granting Association's motion for partial summary judgment as to Count I and (2) December 19, 2016 order denying Clay's motion for leave to file a counterclaim. We vacate the circuit court's (1) June 28, 2017 order granting Association's motion for partial summary judgment as to

Count III and (2) November 15, 2017 amended final judgment, and remand this case to the circuit court for further proceedings consistent with this Memorandum Opinion.

DATED:  Honolulu, Hawai'i, May 26, 2023.

| | |
|---|---|
| On the briefs: | /s/ Katherine G. Leonard<br>Presiding Judge |
| Terrance M. Revere,<br>Andrew D. Chianese,<br>for Defendant-Appellant. | /s/ Clyde J. Wadsworth<br>Associate Judge |
| Peter W. Olson,<br>John P. Duchemin,<br>(Cades Schutte),<br>for Plaintiff-Appellee. | /s/ Sonja M.P. McCullen<br>Associate Judge |